IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                                                          No. CR 09-1463 BB

JUAN AYVAR-LOPEZ,

        Defendant.

## MEMORANDUM OPINION
## ON MOTION TO SUPPRESS

THIS MATTER is before the Court on the motion of Defendant, Juan Ayvar-Lopez, to suppress all evidence seized from his home [doc. 27].  After reviewing all the submissions of the parties and holding an evidentiary hearing on April 6, 2010, the Court finds the motion should be Granted in Part and Denied in Part.

### Facts

On April 9, 2009, Drug Enforcement Administration ("DEA") Agent Thomas Bartusiak initiated an investigation involving individuals using a telephone which was being intercepted by DEA agents in Phoenix, Arizona. The phone was subscribed to by Juan Ayvar-Lopez at an address on Clark SW in Albuquerque, NM.

Agent Bartusiak obtained a court order for the purpose of obtaining GPS coordinates for the location of the telephone. Upon receiving the order, the agent

learned that the phone was being used in the area of the Spring Park Apartments in Northeast Albuquerque and on Brookline Avenue in Northwest Albuquerque. Agent Bartusiak saw a silver Ford F–150 pickup at both locations and saw a man who later proved to be the Defendant, Juan Ayvar-Lopez, getting out of it at a local mall. When the DEA in Phoenix did a takedown on the Arizona suspects, Agent Bartusiak became concerned the Albuquerque suspects might flee.

    At 10:00 AM on May 1, 2009, after noting that the silver Ford was parked at the Spring Park Apartments, Agents Bartusiak and Joe Mata knocked on the door of Apartment 102. Bartusiak and Mata were wearing street clothes and neither was displaying a weapon. Audrey Thomas ("Thomas") answered the door in a tank top and shorts, and Bartusiak asked if anyone else was home with her. Ms. Thomas stated that her husband, Juan, and their son were both home. Bartusiak identified himself as a federal agent and asked Ms. Thomas if she wanted to change into clothing more suitable for conversation and she agreed, and withdrew into the apartment. Bartusiak told her to leave the door open. When she returned, Bartusiak asked if he and Mata could come in and Ms. Thomas consented. When asked about her husband, she led them to the back bedroom where a male was sitting on the edge of the bed. Bartusiak identified himself as a DEA agent and the male identified himself as Juan Ayvar-Lopez. Defendant produced identification showing the Clark SW address and Bartusiak asked him about his citizenship. Ayvar-Lopez stated that he was currently in the United

States illegally, but that he was married to a United States citizen and was going through the process to become a citizen. Bartusiak then called Immigration and Customs Enforcement ("ICE") to investigate Ayvar-Lopez's status.

Agent Bartusiak then said they had reason to suspect Ayvar-Lopez of dealing narcotics. Ayvar-Lopez denied it and when Bartusiak asked to search the apartment, Defendant said, "Sure, I have nothing to hide." Ayvar-Lopez then read and signed a consent to search form in Spanish, the language which Bartusiak used to converse with Defendant. Shortly thereafter, ICE agents arrived and after briefly questioning Ayvar-Lopez determined he was illegally in the country, cuffed him, and took him into custody, but he was not Mirandized. Shortly thereafter, Agents Bartusiak and Mata were joined by other DEA agents. Cell phones were found under Defendant's pillow as well as his truck keys and a closet safe. The agents then used the keys to search Defendant's truck. Agent Bartusiak called the ICE agents who were transporting Ayvar-Lopez and asked them to find out where the safe key was. Ayvar-Lopez told them and the information was relayed to Bartusiak who proceeded to find the key and open the safe. Agents then continued their search of the apartment, seizing various miscellaneous documents.

During the search, Ms. Thomas had been ordered to sit on the couch in the living room. After the search and agents had left, DEA Agent Scott Godier returned to Ms. Thomas' door and asked her for her husband's keys. Ms. Thomas searched for her

husband's keys and voluntarily turned them over to Agent Godier. When they arrived at 10720 Brookline NW where Juan Ayvar-Lopez's brother lived, they found one of Defendant's keys opened that door and a safe similar to the one at the Spring Park Apartments.

## Discussion

I.   *Ms. Thomas Voluntarily Permitted the DEA Agents Permission to Enter*

Although they requested she leave the front door open while she changed clothing, nothing in the agents' appearance or requests communicated to Ms. Thomas that she was not free to terminate the interview. The Court finds Ms. Thomas voluntarily permitted Agent Bartusiak to enter the apartment and Defendant Ayvar-Lopez voluntarily permitted the agents to search the apartment. Government agents can conduct a search without a warrant or probable cause if the suspect voluntarily consents to it. *United States v. Thompson*, 524 F.3d 1126, 1133 (10th Cir. 2008).

II.  *Mr. Ayvar-Lopez Did Not Give the Agents his Safe Keys or Voluntarily Consent to its Search*

After describing his immigration status and giving consent to a search, Mr. Ayvar-Lopez was arrested and taken away by ICE agents. At that time, DEA agents were then in the process of searching the apartment but had not found Defendant's safe and therefore did not ask for his consent to search it. Ms. Thomas was asked about a key for the safe but denied any knowledge of or authority over the safe. After Defendant was arrested and being transported, but before he was given any *Miranda*

warnings, Ayvar-Lopez was asked by the ICE agents the location of the key for the safe. Based on the fact Defendant was a foreign national who was handcuffed, arrested, and transported to ICE headquarters, all without any *Miranda* warning, any incriminating information he provided was not voluntary. The government must "present clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." *United States v. Pena-Sarabia*, 297 F.3d 983, 986 (10th Cir. 2002). The Court finds the Government failed to carry this burden. *See United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997); *United States v. Jones*, 846 F.2d 358, 360-61 (6th Cir. 1988). Moreover, Defendant was not asked for permission to open or search the safe but simply told to disclose the location of the key. *See United States v. Weidul*, 325 F.3d 50, 53-54 (1st Cir. 2003).

Defendant contends the key to the safe would inevitably have been discovered and its contents are therefore not subject to the exclusionary rule. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). In order to invoke this rule, the discovery must have been inevitable and not merely hypothetically possible. *United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986); *United States v. Roof*, 103 Fed. Appx. 652 (10th Cir. 2004). The Court cannot say with any certainty that the DEA would have found a key in the dresser drawer and concluded it opened the safe in the closet.

### III. *The Truck Keys*

Agent Bartusiak found a key ring with several keys on the bedroom dresser. Defendant Ayvar-Lopez was on his way to the ICE office at the time and did not give his consent to take the keys to the parking lot and have his truck searched. Nonetheless, Agent Godier took the keys and opened the truck. When he returned, Ms. Thomas, the registered owner of the truck, asked to take a couple of keys off the key ring. Bartusiak agreed to let her get the keys she needed. Agent Godier later returned to the apartment and asked Ms. Thomas if he could have the key ring back, and she handed him the key ring.

The DEA agents initially took the F-150 Ford truck keys without consent and without probable cause to believe it contained contraband or evidence of criminal activity. *United States v. Valdez-Hocker*, 333 F.3d 1206, 1210 (10th Cir. 2003). "When a consensual search is preceded by a Fourth Amendment violation, ... the government must prove not only (1) the voluntariness of the consent under the totality of the circumstances, but the government must also establish (2) a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Carter*, 360 F.3d 1235, 1243 (10th Cir. 2004) (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994)). When Ms. Thomas, the registered owner of the truck, turned the keys over to Agent Godier after removing the keys she wanted from the key ring, this was sufficiently attenuated and voluntary consent to search the truck.

*United States v. Patten*, 183 F.3d 1190, 1195 (10th Cir. 1999); *United States v. Gordon*, 173 F.3d 761, 765-66 (10th Cir. 1999). This is emphasized by the fact that Ms. Thomas had earlier said she had no authority over the safe and denied any knowledge of, or permission for, access. Therefore, anything found in the truck during the initial search must be suppressed, but anything found after its owner, Ms. Thomas, voluntarily turned over the keys is potentially admissible.

## *Conclusion*

Ms. Thomas voluntarily permitted Agent Bartusiak to enter the apartment and Defendant Ayvar-Lopez voluntarily permitted the agents to search the apartment. Ayvar-Lopez did not voluntarily disclose the location of the key and the Court cannot say with any certainty that the DEA agents would have found a key in the dresser drawer and concluded it opened the safe in the closet. Anything found in the truck during the initial search must be suppressed, but anything found after its owner, Ms. Thomas, voluntarily turned over the keys is potentially admissible. An Order will be filed herewith.

_____
**BRUCE D. BLACK**
**United States District Judge**